## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ERIN HITCHNER and JONATHAN W. WALKER, individually and all behalf of all others similarly situated, | Civil Action No. |
| Plaintiffs, | **Class Action Complaint** |
| v. | |
| GATEWAY ENERGY SERVICES CORPORATION, | |
| Defendant. | |

Plaintiffs Erin Hitchner and Jonathan W. Walker ("Plaintiffs"), by and through their undersigned counsel, Kohn, Swift & Graf, P.C. and Barbat, Mansour & Suciu PLLC on behalf of themselves and all other persons similarly situated, bring this Class Action Complaint against Gateway Energy Services Corporation ("Gateway" or "Defendant"), and allege as follows upon personal knowledge as to themselves and their own acts and experiences and, as to all other matters, upon information and belief based upon, *inter alia*, investigations conducted by their attorneys.

## NATURE OF THIS CASE

1. This action seeks to redress the deceptive and bad faith pricing practices of Defendant that have caused thousands of New Jersey consumers to pay considerably more for their electricity than they should otherwise have paid.

2. Defendant has taken advantage of the deregulation of the retail electricity market in New Jersey by luring consumers into switching energy suppliers with false promises that it offers market-based variable rates for electricity.

{00178553 }

3.      Defendant's representations are deceptive. In fact, Defendant's variable rates are substantially higher than those otherwise available in the energy market, and its rates do not reflect changes in the wholesale cost that Defendant pays for the energy it supplies to its retail customers. As a result, New Jersey consumers are being fleeced millions of dollars in exorbitant charges for electricity.

4.      Plaintiffs, on behalf of the class they seek to represent, bring this lawsuit based on Gateway's breach of contract, breach of the implied covenant of good faith and fair dealing, and unjust enrichment under common law, as well as to redress Defendant's unlawful and unconscionable consumer practices under the New Jersey Consumer Fraud Act, N.J.S.A. § 56:8-1 *et seq*. Through its deceptive and unconscionable practices, upon information and belief, Gateway bilked the class, tens of thousands of current and former customers with variable-rate electricity plans, out of millions of dollars. Accordingly, this lawsuit seeks, *inter alia*, injunctive relief, actual damages and refunds, treble damages, punitive damages, attorneys' fees, and the costs of this suit.

## PARTIES

5.      Plaintiffs Erin Hitchner and Jonathan W. Walker are married citizens of New Jersey residing in Woodstown, New Jersey. Ms. Hitchner and Mr. Walker were customers of Gateway from approximately 2011 through approximately July 2017, and as a result of Defendant's deceptive conduct, they incurred excessive charges for electricity.

6.      Defendant Gateway is a citizen of New York, having been organized under the laws of New York, and with a principal place of business or corporate headquarters in Montebello, New York, in Rockland County. Gateway has thousands of customers in New Jersey, and tens of millions of dollars in revenues.

## JURISDICTION

7. This Court has original jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. § 1332 (the "Class Action Fairness Act").

8. This action meets the prerequisites of the Class Action Fairness Act, because the claims of the Class defined below exceed the sum or value of $5,000,000; the Class has more than 100 members; and diversity of citizenship exists between at least one member of the Class and Defendant.

9. The Court has personal jurisdiction over Defendant Gateway because it is incorporated in New York and is headquartered in this judicial district.

## OPERATIVE FACTS

### The History Of New Jersey's Energy Industry

10. In 1999, New Jersey deregulated the market for electricity supply, a major break with past policy. Prior to deregulation, electricity was supplied and distributed solely by local utility companies. Over the last several years, a number of states, including New Jersey[1], have begun to change the regulations in the energy industry purportedly to enhance competition between energy providers. The notion is that competition would result in independent energy companies ("ESCOs") being more aggressive than the utility in reducing wholesale purchasing costs and thereby lower retail residential rates.

11. ESCOs such as Gateway have various options to buy electricity at wholesale for resale to retail customers in New Jersey, including: owning electricity production facilities;

---

[1] New Jersey consumers who do not choose to switch to an ESCO for their energy supply continue to receive their supply from their local utility. In New Jersey, the Board of Public Utilities ("NJBPU") holds market-based auctions that purchase electricity on behalf of such customers; the utilities then charge these customers a rate based upon the market-based auction outcome. A third-party consultant on behalf of the NJBPU manages the auctions, and the bidding processes and results are made publicly available. As a result, these auctions reflect market-determined prices.

{00178553 }                                    3

purchasing electricity from wholesale marketers and brokers at the price available at or near the time it is used by the retail consumer; and by purchasing electricity in advance of the time it is used by consumers, either by purchasing electricity to be used in the future or by purchasing futures and forward contracts for the delivery of electricity in the future at a predetermined price. The point of deregulation is to allow ESCOs to use these and other innovative purchasing strategies to reduce electricity costs.

12. As part of the deregulation plan, ESCOs (like Gateway) do not have to file the electricity rates they charge with the New Jersey Board of Public Utilities ("NJBPU") or the method by which they set their rates.

13. If a customer switches to an ESCO, the customer will have his or her energy "supplied" by the ESCO, but still "delivered" by their existing utility. The customer's existing utility continues to bill the customer for both the energy supply and delivery costs. The only difference to the customer is which company sets the price for the customer's energy supply.

14. After a customer switches to an ESCO, the customer's energy supply charge—based either on a customer's kilowatt-hour (for electricity)—is calculated using the supply rate charged by the ESCO and not the regulated rate charged by customer's former utility. The supply rate charged is itemized on the customer's bill as the number of kilowatt-hours ("kWh") multiplied by the rate. For example, if a customer uses 300 kWh at a rate of 11.0¢ per kWh, the customer will be billed $33.00 (300 times $.11) for his/her energy supply.

15. Defendant takes advantage of the deregulation and the lack of regulatory oversight in the energy market to deceptively charge New Jersey consumers exorbitant rates for electricity. In theory, energy deregulation allows consumers to shop around for the best energy rates. However, Defendant exploits the deregulated market by using the false promise of competitive rates based on market conditions in order to deceive consumers into purchasing

energy from it.  In fact, Defendant's rates are substantially higher than rates charged by other ESCOs or local utilities and bear no relation to other market rates or the wholesale cost of electricity.

16.     The end result is that, instead of benefitting from switching to Gateway, a typical customer loses out – to the tune of hundreds or even thousands of dollars per year.  Thus, Gateway deceptively causes its customers to pay considerably more for electricity services than they should have and otherwise would have paid.

**Plaintiffs' Hitchner and Walker's Experience**

17.     In or around December 2010, Defendant solicited Plaintiffs to switch from their local utility, Atlantic City Electric ("ACE"), to Defendant's electricity service.  In a telephone call, a Gateway sales representative offered lower rates for electricity than the rates Plaintiffs were paying with ACE.

18.     On or around December 13, 2010, and prior to signing up with Gateway, Defendant also solicited Plaintiffs with a letter, which Plaintiffs read and on which they relied, representing that its electricity price is "22% Below Atlantic City Electric Utility Prices."  *See* Gateway Letter, attached as Exhibit "A".

19.     Furthermore, in a separate letter dated December 14, 2010, Gateway promised that "[w]e are dedicated to your complete satisfaction by providing you with competitive energy prices, attractive pricing plans and excellent customer service."  Gateway further promised that "you will benefit from our energy-buying expertise."  In addition, Gateway represented that its "fixed-rate plans are intended to protect you from future price increases."  *See* Gateway Letter, attached as Exhibit "B".

20.     As a result of Defendant's solicitations, Plaintiffs made the switch to Defendant for electricity in January 2011.

{00178553 }                                          5

21.     Plaintiffs were initially placed on a fixed-rate plan for electricity, but they were subsequently switched to a variable rate plan.

22.     The representation that Defendant's variable rate would be based on market prices was reinforced and confirmed by Defendant's solicitation in the form of a standard Residential Terms & Conditions, which was provided to Plaintiffs.  The Terms & Conditions (attached as Exhibit "C") represent that the variable rate "is a rate set by us each month based on our evaluation of a number of factors that affect the total price of . . . electricity . . . the major components that influence our analysis in a typical month[include] . . . the cost of . . . electricity . . . obtained for delivery to customers in your utility territory for the upcoming month.  Because we often acquire supply over time in preparation for future deliver needs (in an effort to mitigate the volatility in price) and do not acquire all of our required . . . electricity from the spot market, our supply costs may not directly follow spot market prices."

23.     Defendant's Terms & Conditions also represents that its prices will be competitive with rates otherwise available in the market: "We evaluate, if known, the prices that your utility and other competitors' in your area plan to charge in the upcoming month."

24.     Any reasonable consumer would understand based on these representations that Defendant's variable rates would be competitive with the rates offered by the local utility and other ESCOs.  Ms. Hitchner and Mr. Walker reasonably expected that Defendant's variable rates for electricity would be based on market conditions, *i.e.*, competitive and reflective of Defendant's wholesale cost for purchasing electricity.

25.     Ms. Hitchner and Mr. Walker paid Defendant's variable rate from approximately 2014 until approximately July 2017.  In or around July or August 2017, they cancelled their

electricity service with Defendant. The following table is a representative sampling[2] which identifies the billing periods during this time, the variable rates Defendant charged Plaintiffs, the corresponding rates Atlantic City Electric would have charged for electricity, and the then-prevailing wholesale rate for electricity:

| Billing Period | Gateway's Rate | Atlantic City Rate | Wholesale Rate[3] |
|---|---|---|---|
| 3/18/17- 4/19/17 | .1503/KWH | .0867/KWH | .0501/KWH |
| 4/20/17-05/18/17 | .1670/KWH | .0867/KWH | .0516/KWH |
| 5/19/17-6/19/17 | .1699/KWH | .0867/KWH-.089346/ KWH[4] | .0437/KWH |
| 6/20/17-7/18/17 | .17755/KWH | .079419/KWH-.089346/KWH[5] | .0482/KWH |

26. That Defendant's variable rate is not in fact a competitive market rate based on the wholesale cost of electricity is demonstrated by the fact that Defendant's rate was significantly higher than ACE's rates. In fact, there are numerous months where Defendant's rate was *more than double ACE's rate*. Furthermore, there are numerous months where Defendant's rate was *more than triple the wholesale rate*.

27. ACE's rates are reflective of market prices because they are based on publicly held auctions. The electric utilities, on behalf of New Jersey, hire a consultant to run an annual

---

[2] Upon information and believe, Gateway overcharged Plaintiffs by at least thousands of dollars in total for electricity as compared to what ACE was charging.
[3] The Wholesale Rate was calculated by adding the Weighted Locational Marginal Pricing (LMP) and other PJM Charges, such as capacity, ancillary services, etc.
[4] From May to June 2017, Plaintiffs' total electricity usage was 1722 kWh. The first rate listed applies to the first 750 kWh used. The second rate listed applies to the remaining 972 kWh used.
[5] From June to July 2017, Plaintiffs' total electricity usage was 1851 kWh. The first rate listed applies to the first 750 kWh used. The second rate listed applies to the remaining 1101 kWh used.

{00178553 }  7

auction to purchase from suppliers/generators.  The auction purchases one-third of the annual electricity demand for three years for consumers that do not choose a third-party supplier.  This is referred to as a rolling three-year auction.

28.     While ACE and Defendant may not purchase electricity in precisely the same manner, overtime, the costs they incur should be commensurate.  Defendant's represent in its Terms & Conditions that it purchases electricity supply in advance to mitigate potential price spikes.  In fact, there is a highly competitive electricity market where Defendant can purchase electricity for future use (either in a physical purchase of electricity for future use or as a swap transaction), and therefore, their cost for purchasing electricity reflects market prices, albeit over a longer term than daily spot rates.  Similarly, ACE and other New Jersey utilities purchase electricity in rolling auctions that cover periods of more than just short term daily purchases.  Therefore, while ACE rates may not precisely match Defendant's rate, they should be commensurate.  Indeed, Defendant represents that one of their major considerations in setting prices is the price that utilities charge for electricity.

29.     That Defendant's rates do not reflect market costs for wholesale electricity is also demonstrated by the disconnect between changes in wholesale electricity prices and Defendant's costs.  While the wholesale (PJM spot market) rate might show more short-term fluctuations than Defendant's costs (because Defendant claims that it does not purchase all of its electricity on the spot market), overtime, the wholesale (PJM spot market) rate is an accurate reflection of wholesale market costs.

30.     The cost of wholesale electricity is the primary component of the non-overhead costs that Defendant incurs.  Indeed, Defendant concedes and represents as much, listing the "cost of . . . electricity" as the first factor in the "major components that influence our analysis in a typical month."

31. The other factors Defendant identifies in the Terms & Conditions other than the wholesale cost of electricity that affect its variable rate (such as transmission and line losses) are relatively small in terms of the overall costs Defendant incurs to provide retail electricity. Therefore, these other cost factors cannot explain the drastic increases in Defendant's variable rate or the reason its rates are disconnected from changes in wholesale costs.

32. Defendant's identification of "profit" amongst the factors it considers does not justify its outrageously high rates. A reasonable consumer might understand that an ESCO will attempt to make a reasonable profit by selling consumers retail electricity. However, such a consumer would also expect that such profits would be consistent with profit margins obtained by other suppliers of electricity in the market, and also that Defendant's profiteering at the expense of its customers would not be so extreme that its rate bears no relation to market prices but is instead outrageously higher.

33. Thus, Defendant's statements with respect to the electricity rates it will charge are materially misleading because consumers do not receive a price based on the specified factors like wholesale costs and competitor pricing. Instead, consumers are charged rates that are substantially higher and untethered from the specified market factors. Defendant intentionally fails to disclose this material fact to its customers because no reasonable consumer who knows the truth about Defendant's exorbitant rates would choose Defendant as an electricity supplier.

34. Defendant's statements and omissions regarding its electricity rates are materially misleading because the most important consideration for any reasonable consumer when choosing an energy supplier is price.

35. Defendant's misstatements and omissions caused injury to Plaintiffs Hitcher and Walker. Plaintiffs would not have enrolled in Defendant's service plan but for its false misrepresentations. Had Plaintiffs known that the rates they would be charged by Defendant

would be substantially higher than their local utility provider and bear no relation to other market rates or the wholesale cost of electricity, they would not have made the decision to switch.

36. Defendant knows full well that it charges a rate that is unconscionably high, and the misrepresentations it makes with regard to the rate being market-based were made for the sole purpose of inducing consumers to sign up for Defendant's electricity supply so that it can reap outrageous profits to the direct detriment of New Jersey consumers without regard to the consequences that high utility bills cause such consumers. As such, Defendant's actions were actuated by actual malice or accompanied by wanton and willful disregard for consumers' well-being.

37. Similarly, other Class members have routinely paid substantially more for their energy supplies since switching to Defendant's electricity plans.

38. Gateway's unfair and deceptive scheme as alleged herein constitutes a continuing violation over the course of each and every time Plaintiffs (or any other class member) was overcharged for electricity. Further, Gateway actively concealed its wrongful conduct by maintaining to Plaintiffs and other members of the class, in Gateway's marketing, invoicing, and other communications directed to consumers, that the prices Gateway charged for electricity were the result of competitive market forces when, in reality, they were the result of Gateway's fraud. Plaintiffs and other members of the class could not discover through reasonable diligence the nature of Gateway's wrongful conduct earlier by virtue of Gateway's active concealment of its wrongdoing.

## CLASS ACTION ALLEGATIONS

39. Plaintiffs bring this action on their own behalf and additionally, pursuant to Rule 23(b)(2) and (3) of the Federal Rules of Civil Procedure, on behalf of the following Class:

> **All of Gateway's New Jersey State residents who were charged a variable rate for electricity from 2014 to the present.**

40. Excluded from the Class are Defendant; any parent, subsidiary, or affiliate of Defendant; any entity in which Defendant has or had a controlling interest, or which Defendant otherwise controls or controlled; and any officer, director, legal representative, predecessor, successor, or assignee of Defendant.

41. This action is brought as a class action for the following reasons:

   a. The Class consists of thousands of persons and is therefore so numerous that joinder of all members, whether otherwise required or permitted, is impracticable;

   b. There are questions of law or fact common to the Class that predominate over any questions affecting only individual members, including:

   i. whether Defendant violated N.J.S.A. 56: 8-1 et seq.;

   ii. whether Defendant breached its contract with New Jersey consumers by charging variable rates not based on market conditions;

   iii. whether Defendant breached the covenant of good faith and fair dealing by exercising its unilateral price-setting discretion in bad faith, *i.e.*, to price gouge;

   iv. whether Plaintiffs and the Class have sustained damages and, if so, the proper measure thereof; and

   v. whether Defendant should be enjoined from continuing to charge variable rates not based on market conditions;

      c.      The claims asserted by Plaintiffs are typical of the claims of the members of the Class;

      d.      Plaintiffs will fairly and adequately protect the interests of the Class, and Plaintiffs have retained attorneys experienced in class and complex litigation, including class litigation involving consumer protection and ESCOs;

      e.      Prosecuting separate actions by individual class members would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for Defendant;

      f.      Defendant has acted on grounds that apply generally to the Class, namely representing that its variable rates are based on market conditions, *i.e.*, competitive and reflective of the wholesale market, when Defendant's rates are in fact substantially higher, so that final injunctive relief prohibiting Defendant from continuing its deceptive practices is appropriate with respect to the Class as a whole;

      g.      A class action is superior to other available methods for the fair and efficient adjudication of the controversy, for at least the following reasons:

           i.      Absent a class action, Class members as a practical matter will be unable to obtain redress, Defendant's violations of their legal obligations will continue without remedy, additional consumers and purchasers will be harmed, and Defendant will continue to retain its ill-gotten gains;

           ii.      It would be a substantial hardship for most individual members of the Class if they were forced to prosecute individual actions;

           iii.      When the liability of Defendant has been adjudicated, the Court will be able to determine the claims of all members of the Class;

  iv. A class action will permit an orderly and expeditious administration of Class claims, foster economies of time, effort, and expense, and ensure uniformity of decisions;

  v. The lawsuit presents no difficulties that would impede its management by the Court as a class action; and

  vi. Defendant has acted on grounds generally applicable to Class members, making class-wide monetary and injunctive relief appropriate.

42. Defendant's violations of N.J.S.A. 56: 8-1 *et seq.*, and the common law are applicable to all members of the Class, and Plaintiffs are entitled to have Defendant enjoined from engaging in illegal and deceptive conduct in the future.

**FIRST CAUSE OF ACTION**
**(Violation of N.J.S.A. 56: 8-1 *et seq.*)**

43. Plaintiffs Hitcher and Walker repeat and re-allege the allegations contained in paragraphs 1-42 above as if fully set forth herein.

44. The Consumer Fraud Act prohibits, *inter alia*:

> The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale or advertisement of any merchandise. . . .

N.J.S.A. § 56:8-2.

45. Plaintiffs and other members of the class are "persons" within the meaning of N.J.S.A. 56:8-1(d).

46. Defendant's conduct alleged herein constitutes a "sale" within the meaning of N.J.S.A. 56:8-1(e).

47. Defendant Gateway has engaged in unfair, unlawful and deceptive acts in trade and commerce which have the capacity and tendency to deceive and, in fact, did deceive Plaintiffs and the class, and damaged Plaintiffs and class members.

48. Defendant's misrepresentations and false, deceptive, and misleading statements and omissions with respect to the variable rates it charges for electricity, as described above, constitute affirmative misrepresentations in connection with the marketing, advertising, promotion, and sale of electricity in violation of the Consumer Fraud Act.

49. Defendant's false, deceptive, and misleading statements and omissions would have been material to any potential consumer's decision to purchase electricity from Defendant.

50. Defendant also failed to inform customers that its variable rates for electricity are substantially higher than those based on the market price of electricity and do not reflect the wholesale cost of purchasing electricity. That information would have been material to any consumer deciding whether to purchase electricity from Defendant.

51. Defendant further deceptively and consciously misrepresented the most determinative factors it uses to set variable rates.

52. Defendant knew at the time it promised prospective customers that they would be charged a variable rate based on market conditions that this promise was false.

53. Defendant made these false, deceptive, and misleading statements and omissions with the intent that consumers rely upon such statements.

54. Defendant's intentional concealments were designed to deceive current and prospective variable rate customers into believing that rates will be commensurate with market conditions and the specified factors in the Terms & Conditions. Defendant benefits from reliance and deprives consumers from informed purchasing decisions and savings.

55. Defendant's affirmative conduct and omissions constitute unlawful practices beyond a mere breach of contract. Rather, Defendant's practices are unconscionable and outside the norm of reasonable business practices.

56. Plaintiffs and the other members of the Class entered into agreements to purchase electricity from Defendant for personal use and suffered ascertainable losses as a direct and proximate result of Defendant's actions in violation of the Consumer Fraud Act.

57. As a consequence of Defendant's wrongful actions, Plaintiffs and the other members of the Class suffered an ascertainable loss of monies based on the difference in the rate they were charged versus the rate they would have been charged had Defendant charged a rate based on market conditions and the factors specified in the Terms & Conditions, or had they not switched to Defendant from their previous supplier.

58. Plaintiffs and other members of the Class suffered an ascertainable loss caused by Defendant's misrepresentations and omissions because they would not have entered into an agreement to purchase electricity from Defendant if the true facts concerning their rates had been known.

59. By reason of the foregoing, Defendant is liable to Plaintiffs and the other members of the Class for trebled compensatory damages, punitive damages, attorneys' fees, and the costs of this suit. N.J.S.A. §§ 56:8-2.11, 8-2.12, 8-19.

60. Defendant knows full well that it charges a rate that is unconscionably high, and the misrepresentations it makes with regard to the rate being market-based were made for the sole purpose of inducing consumers to sign up for Defendant's electricity supply so that it can reap outrageous profits to the direct detriment of New Jersey consumers without regard to the consequences high utility bills cause such consumers. As such, Defendant's actions were unconscionable and actuated by bad faith, lack of fair dealing, actual malice, or accompanied by

wanton and willful disregard for consumers' well-being. Defendant is therefore additionally liable for punitive damages, in an amount to be determined at trial.

## SECOND CAUSE OF ACTION
**(Breach of Contract)**

61. Plaintiffs Hitcher and Walker repeat and re-allege the allegations contained in paragraphs 1-42 above as if fully set forth herein.

62. Plaintiffs and the other members of the Class entered into valid contracts with Defendant for the provision of electricity.

63. Pursuant to the Agreement, Defendant agreed to charge a variable rate for electricity based on market conditions, in particular the wholesale cost of purchasing electricity for delivery to customers from the same utility territory, and the prices charged by local utility companies and other competitors.

64. Pursuant to the Agreement, Plaintiffs and the other members of the Class paid the variable rates charged by Defendant for electricity.

65. However, Defendant failed to perform its obligations under the Agreement to charge rates based primarily upon electricity costs and additional market conditions. Indeed, Defendant charged a variable rate for electricity that was untethered from the factors upon which the parties agreed the rate would be based.

66. Plaintiffs and the other members of the Class were damaged as a result because they were billed, and they paid, a charge for electricity that was higher than they would have been had Defendant based its rates on the factors agreed upon.

67. By reason of the foregoing, Defendant is liable to Plaintiffs and the other members of the Class for the damages that they have suffered as a result of Defendant's actions, the amount of such damages to be determined at trial, plus attorneys' fees.

## THIRD CAUSE OF ACTION
### (Breach of Implied Covenant of Good Faith and Fair Dealing)

68.     Plaintiffs Hitcher and Walker repeat and re-allege the allegations contained in paragraphs 1-42 above as if fully set forth herein.

69.     Every contract in New Jersey contains an implied covenant of good faith and fair dealing in the performance and enforcement of the contract.  The implied covenant is an independent duty and may be breached even if there is no breach of a contract's express terms.

70.     Under the contract, Defendant had unilateral discretion to set the variable rate for electricity based on market conditions and other factors, such as the amount of profit Defendant hoped to earn from the sale of electricity in a customer's utility area.

71.     Plaintiffs reasonably expected that the variable rates for electricity would, notwithstanding Defendant's profit goals, reflect the market and wholesale prices for electricity and that Defendant would refrain from price gouging.  Without these reasonable expectations, Plaintiffs and other Class members would not have agreed to buy electricity from Defendant.

72.     Defendant breached the implied covenant of good faith and fair dealing by arbitrarily and unreasonably exercising its unilateral rate-setting discretion to price gouge and frustrate Plaintiffs and other Class members' reasonable expectations that the variable rates for electricity would be commensurate with market conditions.

73.     As a result of Defendant's breach, Defendant is liable to Plaintiffs and other members of the Class for actual damages in an amount to be determined at trial, and attorneys' fees.

## FOURTH CAUSE OF ACTION
### (Unjust Enrichment)

74.     Plaintiffs repeat and re-allege the allegations contained in paragraphs 1-42 above as if fully set forth herein.

{00178553 }                                                         17

75. By engaging in the conduct described above, Defendant has unjustly enriched itself and received a benefit beyond what was contemplated in the contract, at the expense of Plaintiffs and the other members of the Class.

76. It would be unjust and inequitable for Defendant to retain the payments that Plaintiffs and the Class(es) made for excessive electricity charges.

77. By reason of the foregoing, Defendant is liable to Plaintiffs and the other members of the Class for the damages that they have suffered as a result of Defendant's actions, the amount of which shall be determined at trial, plus attorneys' fees.

WHEREFORE, Plaintiffs respectfully request that the Court should enter judgment against Defendant as follows:

1. Certifying this action as a class action, with the Class as defined above;

2. On Plaintiffs' First Cause of Action, awarding against Defendant damages that Plaintiffs Hitchner and Walker and the other members of the Class have suffered, trebled, and granting appropriate injunctive relief;

3. On Plaintiffs' Second Cause of Action, awarding against Defendant damages that Plaintiffs Hitchner and Walker and the other members of the Class have suffered as a result of Defendant's actions;

4. On Plaintiffs' Third Cause of Action, awarding against Defendant damages that Plaintiffs Hitchner and Walker and the other members of the Class have suffered as a result of Defendant's actions;

5. On Plaintiffs' Fourth Cause of Action, awarding against Defendant damages and/or injunctive relief that Plaintiffs Hitchner and Walker and the other members of the Class have suffered as a result of Defendant's actions;

6. Awarding Plaintiffs and the Class punitive damages;

7. Awarding Plaintiffs and the Class interest, costs, and attorneys' fees; and

8. Awarding Plaintiffs and the Class such other and further relief as this Court deems just and proper.

## DEMAND FOR TRIAL BY JURY

Pursuant to Federal Rule of Civil Procedure Rule 38, Plaintiffs hereby demand a trial by jury.

Dated: January 16, 2018

Respectfully Submitted By:

/s/ Jonathan Shub
Jonathan Shub (N.Y. Bar # 4747739)
Kevin Laukaitis (*Pro Hac Vice Forthcoming*)
**KOHN, SWIFT & GRAF, P.C.**
One South Broad Street, Suite 2100
Philadelphia, PA 19107-3304
(215) 238-1700 – phone
(215) 238-1968 – facsimile
jshub@kohnswift.com
klaukaitis@kohnswift.com

Nick Suciu III (*Pro Hac Vice Forthcoming*)
**BARBAT, MANSOUR & SUCIU PLLC**
1644 Bracken Road
Bloomfield Hills, Michigan 48302
(313) 303-3472 – phone
nicksuciu@bmslawyers.com

*Attorneys for Plaintiffs and the Putative Class*